UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAUL MARQUEZ MEDINA,

      Petitioner,

                               Case No.: 2:26-cv-10416

v.                                  Hon. Gershwin A. Drain

U.S. DEPARTMENT OF HOMELAND
SECURITY, EXECUTIVE OFFICE OF
IMMIGRATION REVIEW, MARKWAYNE
MULLIN, *Secretary of the U.S. Department of
Homeland Security*, TODD BLANCHE, *U.S.
Attorney General*, KEVIN RAYCRAFT,
*Immigration and Customs Enforcement,
Director of Detroit Field Office,* TRACY
DECAUSSIN, *Administrator of the St. Clair
County Jail*,[1]

      Respondents.

_____/

## OPINION AND ORDER GRANTING THE PETITION FOR HABEAS CORPUS [ECF No. 1] AND ORDERING THAT PETITIONER BE IMMEDIATELY RELEASED OR, IN THE ALTERNATIVE, GIVEN A BOND HEARING WITHIN SEVEN (7) DAYS OF THE DATE OF THIS ORDER

---

[1] The lawsuit named Kristi Noem as the Secretary of the U.S. Department of Homeland Security and Pamela Bondi as the U.S. Attorney General. As they no longer hold office, their successors are automatically substituted in their place. *See* Fed. R. Civ. P. 25(d).

1

## I.    INTRODUCTION

Presently before the Court is Petitioner Raul Marquez Medina's Petition for Writ of Habeas Corpus. Petitioner claims that he has been in immigration detention without bond in the St. Clair County Jail since December 17, 2025, and that his detention without bond violates the Immigration and Nationality Act ("INA") and the Due Process Clause of the Fifth Amendment. Respondents oppose the petition. The Court concludes that a hearing will not aid in the disposition of this petition and will determine the outcome on the briefs. E.D. Mich. L.R. 7.1(f)(2). For the reasons that follow, the Petition for Writ of Habeas Corpus [ECF No. 1] is GRANTED. It is ORDERED that Respondent Kevin Raycraft (Director of the Detroit Field Office of Immigration and Customs Enforcement) IMMEDIATELY RELEASE Petitioner or, in the alternative, provide Petitioner with a bond hearing before an Immigration Judge WITHIN 7 DAYS OF THE DATE OF THIS ORDER.

Furthermore, Respondents U.S. Department of Homeland Security, Executive Office for Immigration Review, Markwayne Mullin (Secretary of the U.S. Department of Homeland Security), Todd Blanche (U.S. Attorney General), and Tracy Decaussin (Administrator of the St. Clair County Jail) are hereby DISMISSED from this case.

## II.   BACKGROUND

Petitioner Raul Marquez Medina is a citizen of Mexico who entered the country unlawfully near Brownsville, Texas in 2023. ECF No. 5, PageID.81. Petitioner was designated an Unaccompanied Minor[2] under 6 U.S.C. § 279(g)(2) and placed into the custody of the Department of Health and Human Services ("DHHS"). ECF No. 2, PageID.27. Petitioner was released from DHHS's custody on May 26, 2023. *Id.* Respondents commenced removal proceedings against Petitioner on February 1, 2024, and Petitioner subsequently applied for asylum. *Id.*; ECF No. 2-2, PageID.49. Petitioner's removal proceedings were terminated due to his pending asylum application, which remains pending to this day. ECF No. 2, PageID.27. Petitioner received a work authorization in 2024 and was steadily employed in construction up to the date of his arrest. *Id.* On account of his long-term residence in the U.S., Petitioner has established ties to the community through the St. Clement of Rome Catholic Church in Romeo, Michigan. ECF No. 1, PageID.8. Petitioner has no criminal history aside from a traffic offense. *Id.*

On December 17, 2025, Petitioner was commuting to work when he was pulled over by a Customs and Border Patrol ("CBP") vehicle. ECF No. 1, PageID.7. CBP agents asked for documentation and proof of immigration status. Petitioner

---

[2] Today, Petitioner is 20 years old. ECF No. 1, PageID.7.

presented his work authorization and his Michigan state-issued license, and explained that he had a pending application for asylum and withholding of removal with U.S. Citizenship and Immigration Services ("USCIS"). *Id.* The agents arrested Petitioner and he was sent to St. Clair County Jail, where he remains today without an opportunity for release on bond. *Id.* Meanwhile, the Department of Homeland Security ("DHS") placed Petitioner in full removal proceedings before the Detroit Immigration Court and charged him with inadmissibility under 8 U.S.C. § 1182(a)(6)(A)(i) for having entered the United States without inspection. *Id*.

Petitioner is one of thousands of noncitizens whose detention without bond is a direct result of a recent DHS policy change. In July 2025, DHS issued an internal memorandum entitled "Interim Guidance Regarding Detention Authority for Applications for Admission." *See Blanco Cabrera v. Raycraft*, No. 4:26-CV-00085-DAR, 2026 WL 904606, at *1 (N.D. Ohio Apr. 2, 2026). This new policy "subjects noncitizens who have resided in the United States for a long time and who are apprehended in the interior of the country to mandatory detention" under 8 U.S.C. § 1225(b)(2), instead of discretionary detention under 8 U.S.C. § 1226(a). *See Moreno-Espinoza v. Ladwig*, No. 2:25-cv-03093-TLP-tmp, 2025 WL 3691452, at *1 (W.D. Tenn. Dec. 19, 2025). It revises DHS's "decades-long interpretation" that most noncitizens already present in the United States were eligible for release on

4

bond or conditional parole during removal proceedings under § 1226(a).[3] *See Kaur v. Raycraft*, No. 4:25-CV-02679, 2026 WL 709728, at *2 (N.D. Ohio Mar. 13, 2026).

The Board of Immigration Appeals ("BIA") issued a decision on September 5, 2025, which agreed with DHS's new interpretations of § 1226(a) and § 1225(b)(2). *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA Sept. 5, 2025). As such, "immigration judges are now bound by precedent which denies noncitizens bond hearings under § 1225(b)(2)(A)[.]" *Moreno-Espinoza*, 2025 WL 3691452, at *2. Consequently, the federal courts have been subject to "a deluge of habeas actions" from detainees in ICE custody who argue that their detention without bond is legally erroneous and unconstitutional. *Garcia Ortiz v. Henkey*, No. 1:26-cv-00043-BLW, 2026 WL 948275, at *1 (D. Idaho Apr. 7, 2026).

Here, Petitioner argues that his detention without an opportunity for bond violates the INA and violates his Fifth Amendment due process rights. *See* ECF No. 1. Respondents disagree, on both statutory and constitutional grounds. *See* ECF No. 5. Respondents also argue that the Court should dismiss all Respondents except Petitioner's immediate custodian and that the Court should require Petitioner to exhaust his administrative remedies.

---

[3] The discretionary detention scheme in § 1226(a) is subject to an exception for noncitizens present in the country with certain criminal histories. *See* § 1226(c)(1). Under this exception, noncitizens with the requisite criminal histories are subject to mandatory detention without bond.

### III.   LEGAL STANDARD

Under 28 U.S.C. § 2241, a district court has the "authority to hear applications for habeas corpus by any person who claims to be held 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Rasul v. Bush*, 542 U.S. 466, 473 (2004). "Section 2241 confers jurisdiction to hear habeas corpus challenges to the legality of a noncitizen's detention." *Lopez v. Olson*, --- F. Supp. 3d ---, No. 3:25-cv-654-DJH, 2025 WL 3217036, at *2 (W.D. Ky. Nov. 18, 2025). "Although the Court 'may not review discretionary decisions made by immigration authorities, it may review immigration-related detentions to determine if they comport with the demands of the Constitution.'" *Id.* (quoting *Deng Chol A. v. Barr*, 455 F. Supp. 3d 896, 901 (D. Minn. 2020)).

### IV.   DISCUSSION

#### a.  Administrative Exhaustion

As an initial matter, Respondents argue that the Court should require Petitioner to exhaust his administrative remedies prior to seeking habeas relief. "Where Congress specifically mandates, exhaustion is required." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)). "But when it is not mandated, the decision to require exhaustion is within the sound discretion of the court." *Lopez-Campos v. Raycraft*, 797 F. Supp. 3d 771, 778 (E.D. Mich. 2025) (citing *McCarthy*, 503 U.S. at

144). Administrative exhaustion is typically not required "where pursuit of administrative remedies would be a futile gesture," *Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1093 (6th Cir. 1981), or where the legal questions are fit for resolution and any "delay means hardship[.]" *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000).

Here, as the Government expressly concedes, the *Matter of Yajure Hurtado* decision is binding on immigration courts, which precludes Petitioner from being successful in pursuit of his administrative remedies. In other words, pursuit of Petitioner's administrative remedies would be futile. "And any delay results in the very harm [Petitioner] is trying to avoid by seeking the bond hearing—detention." *Lopez-Campos*, 797 F. Supp. 3d at 799. Therefore, the Court will not require administrative exhaustion here.

**b. Statutory Framework & Interpretation of the INA**

"Two statutes principally govern the detention of noncitizens pending removal proceedings: 8 U.S.C. §§ 1225 and 1226." *Gomes v. Hyde*, 804 F. Supp. 3d 265, 268–69 (D. Mass. 2025). To begin, 8 U.S.C. § 1226(a) provides "a discretionary detention framework," *see Lopez-Campos v. Raycraft*, 797 F. Supp. 3d 771, 777 (E.D. Mich. 2025), for "aliens already present in the United States." *Jennings v. Rodriguez*, 583 U.S. 281, 303 (2018). That section permits the arrest and detention

of a noncitizen pending a decision on whether the noncitizen is to be removed from the United States, but it provides that the noncitizen may be released on bond of at least $1,500 or on conditional parole during those proceedings. 8 U.S.C. § 1226(a)(2). This "is considered the 'usual removal process.'" *Chogllo Chafla v. Scott*, 804 F. Supp. 3d 247, 256 (D. Me. 2025) (citing *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020)). "The only exception to section 1226's discretionary detention regime is that the Attorney General 'shall take into custody' any noncitizen involved in certain enumerated criminal activities." *Id.* (citing 8 U.S.C. § 1226(c)(1)).[4]

---

[4] A noncitizen falls into this exception—and is subject to mandatory detention—if he:

> (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
> (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year,
> (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title, or
> (E)(i) is inadmissible under paragraph (6)(A), (6)(C), or (7) of section 1182(a) of this title; and
> (ii) is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]

8 U.S.C. § 1226(c)(1).

On the other hand, "[s]ection 1225(b) 'supplement[s] § 1226's detention scheme.'" *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1246 (W.D. Wash. 2025) (quoting *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1197 (9th Cir. 2022)). It applies to noncitizens "seeking admission into the country[.]"*Jennings*, 583 U.S. at 289. Under "8 U.S.C. § 1225, an alien who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission.'" *Jennings*, 583 U.S. at 287 (citing 8 U.S.C. § 1225(a)(1)). These noncitizens "fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." *Id.* "Section 1225(b)(1) concerns the inspection of noncitizens arriving in the United States and certain other noncitizens who have not been admitted or paroled." *Rodriguez*, 779 F. Supp. 3d at 1247 (cleaned up). Such noncitizens are "normally ordered removed 'without further hearing or review' pursuant to an expedited removal process[.]" *Id.* (quoting *Jennings*, 583 U.S. at 287). Section 1225(b)(2) involves the inspection of "other" noncitizens who are applicants for admission and "seeking admission." *See* 8 U.S.C. § 1225(b)(2). "Individuals detained under § 1225 are not entitled to a bond hearing," and other than limited exceptions not implicated here, "detention… is considered mandatory." *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 484 (S.D.N.Y. 2025).

9

> ### i.  *Interpretation of Plain Text of § 1225(b)(2)*

According to Respondents, Petitioner is properly detained without bond under § 1225(b)(2). Respondents argue that Petitioner falls into the plain language of the term "applicant for admission," which subjects him (and indeed, millions of other noncitizens in the same position as him) to detention without bond under § 1225(b)(2)'s supplemental detention framework to § 1226(a). Petitioner, in contrast, argues that he does *not* fall into § 1225(b)(2)'s plain language and scope, because he is not seeking admission before an immigration officer. Therefore, he asserts that his detention should fall under § 1226(a), which provides a detainee with a chance for bond. The Court agrees with Petitioner.

"The Court begins its review on the merits by examining the plain text of the relevant statutory provisions." *Duran-Rojas v. Raycraft*, No. 25-cv-14051, 2026 WL 243205, at *6 (E.D. Mich. Jan. 29, 2026). When interpreting statutory text, courts should "assign each word of the statute its ordinary, contemporary, common meaning… while keeping in mind that statutory language has meaning only in context." *Kentucky v. Biden*, 23 F.4th 585, 603 (6th Cir. 2022) (cleaned up and citations omitted). Moreover, a statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" *Corley v. United States*, 556 U.S. 303, 314 (2009).

Section 1225(b)(2)(A) states in its entirety that:

Subject to subparagraphs (B) and (C),[5] in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A). As relevant here, an "applicant for admission" is statutorily defined as "[a]n alien present in the United States who has not been admitted or who arrives in the United States…" 8 U.S.C. § 1225(a)(1).

Respondents assert that Petitioner is an "applicant for admission" because he is present in the United States and, because he entered illegally, he has not been admitted. According to Respondents, "all unadmitted noncitizens present in the United States are 'applicants for admission,' regardless of their proximity to the border, the length of time they have been present in the United States, or whether they ever had the subjective intent to properly apply for admission." ECF No. 5, PageID.87.

Even if Petitioner falls into the definition of applicant for admission, however, Respondents' analysis ignores critical portions of § 1225(b)(2): "seeking admission" before an "examining immigration officer." The term "seeking," which is not statutorily defined, must be interpreted to have its ordinary meaning. And the term "seeking" "implies action—something that is currently occurring[.]" *Lopez-Campos*, 797 F. Supp. 3d at 781; *see also Lopez Benitez*, 795 F. Supp. 3d at 488

---

[5] Subparagraphs (B) and (C) are not relevant here.

("[T]he phrase 'seeking admission,' though undefined in § 1225(b)(2)(A), necessarily implies some sort of present-tense action." (quotation marks omitted)). "Admission" is statutorily defined as "the lawful *entry* of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. 1101(a)(13)(A) (emphasis added). While "entry" is not statutorily defined, it "has long been understood to mean 'a crossing into the territorial limits of the United States.'" *Briceno Solano v. Mason*, --- F. Supp. 3d ---, No. 2:26-cv-00045, 2026 WL 311624, at *12 (S.D. W. Va. Feb. 4, 2026) (quoting *Hing Sum v. Holder*, 602 F.3d 1092, 1100–01 (9th Cir. 2010)); *see also United States ex rel. Volpe v. Smith*, 289 U.S. 422, 425 (1933) (defining "entry" as the "coming of an alien from a foreign country into the United States.").

Taking everything together, Petitioner is not a noncitizen who is "seeking admission." Petitioner is not "presently asking for, or trying to presently gain, entry into the United States," as would be required if he were *seeking admission*—i.e., seeking a lawful entry. *Gu v. Noem*, No. 3:26-cv-00036, 2026 WL 621356, at *8 (N.D. Ohio Mar. 5, 2026). Rather, Petitioner has already been present in the interior of the United States for years and was not "seeking" to enter the country at the time of his apprehension. *See Selvin Adonay E.M. v. Noem*, --- F. Supp. 3d ---, No. 25-cv-3975 (SRN/DTS), 2025 WL 3157839, at *4 (D. Minn. Nov. 12, 2025) ('[A]n alien seeking admission is a noncitizen who, at the time of his arrest, is actively and

presently pursuing inspection and authorization by an immigration officer to lawfully enter the United States."). This fact alone demonstrates that he does not fall within the plain parameters of § 1225(b)(2).

Respondents argue that "entry" is akin to the *legal* right to be in this country, and a noncitizen's prior "*physical* entry has no bearing on this analysis." ECF No. 5, PageID.88 (emphasis in original). Specifically, according to Respondents, an applicant for admission (a noncitizen that has not been lawfully admitted) who does not agree to immediately depart must *always* be seeking a lawful entry, which Respondents equate to a legal means to remain in the country. *Id.* at PageID.88–90 (stating that because Petitioner "has not agreed to immediately depart… logically he must be seeking to remain, which requires an 'admission' i.e., a lawful entry."). Even if "entry" could be construed as ambiguous—i.e., possibly meaning "the legal right to be here" as Respondents claim, or possibly meaning "the act of entering the country," as Petitioner claims—the Court turns to the canon of statutory construction that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Alvarez Ortiz v. Freden*, 808 F. Supp. 3d 579, 591 (W.D.N.Y. 2025) (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).

Respondents' preferred interpretation would result in "seeking admission" being superfluous because if an applicant for admission is necessarily seeking

13

admission (i.e., a lawful entry) by virtue of simply being here, "the words 'seeking admission' would be surplusage." *Id.*

> After all, Congress simply could have said 'if the examining immigration officer determines that *an applicant for admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained.' Instead, however, Congress said that an alien who is an applicant for admission *and who is seeking admission* shall be detained if the examining immigration officer determines that he or she is not clearly entitled to be admitted. 8 U.S.C. § 1225(b)(2)(A).

*Id.* "So 'seeking admission' cannot be synonymous with 'applicant for admission.' It must refer to seeking physical entry at the border, not the legal right to enter." *Id.* at 592. Petitioner's preferred interpretation allows both "applicant for admission" and "seeking admission" to do independent work. Under Petitioner's interpretation, a noncitizen falls under § 1225(b)(2) if he was not admitted—i.e., did not lawfully enter—*and* is presently at the border seeking to enter the country.

In any event, the term "seeking admission" is also accompanied by the term "examining immigration officer" in § 1225(b)(2). Section 1225(b)(2) only applies to noncitizens whom an *examining* immigration officer has determined are not clearly and beyond a doubt entitled to be admitted. *See* 8 U.S.C. § 1225(b)(2). The term "examining," also used in its present participle form like "seeking," similarly connotes "something that is currently occurring[.]" *Lopez-Campos*, 797 F. Supp. 3d at 781. And "'examination' is not an unbounded concept. Rather, it is the specific legal process one undergoes while trying to enter the country." *Romero v. Hyde*, 795

14

F. Supp. 3d 271, 283 (D. Mass. 2025) (citing 8 C.F.R. § 235.1 ("Scope of examination")). In other words, § 1225(b)(2) "applies only where the alien is 'seeking admission' *at the same time* an 'examining immigration officer' determines that he is not clearly and beyond a doubt entitled to be admitted." *Hurtado-Medina v. Raycraft*, No. 25-cv-13248, 2025 WL 3268896, at *9 (E.D. Mich. Nov. 24, 2025) (emphasis in original). Not only was Petitioner not seeking to *enter* the country when he was detained, but there is no evidence that an immigration officer simultaneously *examined* him and determined "clearly and beyond a doubt" that Petitioner was inadmissible. *See Duran-Rojas*, 2026 WL 243205, at *7 ("[A]n examining immigration officer never determined that… petitioner was not clearly and beyond a doubt entitled to be admitted.").

As stated by the Southern District of New York, the Court's finding "accords with the plain, ordinary meaning of the words 'seeking' and 'admission.'" *Lopez Benitez*, 795 F. Supp. 3d at 489.

> For example, someone who enters a movie theater without purchasing a ticket and then proceeds to sit through the first few minutes of a film would not ordinarily then be described as "seeking admission" to the theater. Rather, that person would be described as already present there. Even if that person, after being detected, offered to pay for a ticket, one would not ordinarily describe them as "seeking admission" (or "seeking" "lawful entry") at that point—one would say that they had entered unlawfully but now seek a lawful means of remaining there. As § 1225(b)(2)(A) applies only to those noncitizens who are actively "seeking admission" to the United States, it cannot, according to its ordinary meaning, apply to Mr. Lopez Benitez, because he has already been residing in the United States for several years.

15

*Id.*

As is the case here. Petitioner has been residing in the United States for several years. He is not seeking a lawful entry before an examining immigration officer—he is seeking to *remain* instead. Congress could have drafted § 1225(b)(2)(A) without the qualifying term "seeking admission," but it chose not to. Respondents' strained reading of the text violates the "basic canon of statutory interpretation that every word in [a] statute is presumed to have meaning and that courts should give effect to all the words to avoid an interpretation which would render words superfluous or redundant." *Blanco Cabrera*, 2026 WL 904606, at *10 (quoting *In re Village Apothecary, Inc.*, 45 F.4th 940, 948 (6th Cir. 2022)) (cleaned up).

Accordingly, the only conclusion is that Petitioner falls under § 1226(a),[6] which provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States," and that the Attorney General may either "continue to detain the arrested alien" or "may release the alien on" bond or conditional parole. 8 U.S.C. § 1226(a). Petitioner was arrested while in the United States, is charged by a warrant

---

[6] There is no argument that Petitioner falls under § 1225(b)(1), which only applies to particular noncitizens and provides for expedited removal proceedings, or § 1226(c)(1), which only applies to noncitizens with particular criminal histories.

16

for having entered the country without authorization, and is detained pending a decision on his removal.

*ii.     Interpretation of the Text in Context of the INA*

Looking beyond the plain text of § 1225(b)(2), the context in which this provision appears demonstrates that Petitioner's reading of the statute—and not Respondents'—is the correct reading. *See Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

"The title of § 1225 is revealing: 'Inspection by immigrations officers; expedited removal of inadmissible arriving aliens; referral for hearing.'" *Velazquez v. Raycraft*, No. 25-cv-13675, 2026 WL 447417, at *4 (E.D. Mich. Feb. 17, 2026) (quoting 8 U.S.C. § 1225). The subheadings for § 1225(a) is "Inspection," for § 1225(b)(2) is "Inspection of Other Aliens," and for § 1225(d) is "Authority relating to inspections." 8 U.S.C. § 1225. "'Inspection' denotes… 'a checking or testing of an individual against established standards'… and to 'inspect' means 'to view closely in critical appraisal: look over' or 'to examine officially.'" *Singh v. Noem*, No. CIV 25-1110 JB/KK, 2026 WL 146005, at *13 (D.N.M. Jan. 20, 2026) (quoting Merriam-Webster.com). The word "inspection" is "difficult to reconcile with mass

17

or abstract enforcement" in the interior of the country, particularly when words like "arrest" and "apprehension" appear nowhere in the statutory provision. *Id.*

Furthermore, the section explicitly addresses arriving aliens, stowaways, and crewmen, "words that suggest arrival at a border or port of entry." *Pizarro Reyes v. Raycraft*, No. 25-cv-12546, 2025 WL 2609425, at *5 (E.D. Mich. Sept. 9, 2025). It also prescribes detailed procedures for inspection and screening of aliens by immigration officers at the border. *See* § 1225(a), (b)(1), (d). The INA's implementing regulations "likewise tie such inspections to the border." *Espinal v. Ybarra*, No. 26-76 JB/GJF, 2026 WL 851254, at *12 (D.N.M. Mar. 27, 2026) (citing 8 C.F.R. § 235.1(a) ("Application to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection…")). "By anchoring § 1225 in inspection concepts that Congress defines, it signals that an inspection at the threshold of entry triggers the powers and procedures [in § 1225]." *Singh*, 2026 WL 146005, at *14.

"By contrast, § 1226 speaks in remarkably different terms." *Id.* at *22. That section is titled "Apprehension and detention of aliens." 8 U.S.C. § 1226. It "employs language associated with warrants… work authorization… and prior convictions[.]" *Singh*, 2026 WL 146005, at *22. (citing 8 U.S.C. § 1226(a), (a)(3), and (c)(1)(E)). The "post-entry language of § 1226 reflects Congress' considered judgment that different procedures are appropriate for preventing entry than for

removing individuals who have already entered and established presence." *Id.* Indeed, this is "[t]he line historically drawn between [§ 1225 and § 1226]." *Martinez v. Hyde*, 792 F. Supp. 3d 211, 221 (D. Mass. 2025).

Respondents argue instead that the structure of § 1225 supports their interpretation. According to Respondents, § 1225(b) differentiates between "arriving aliens" in (b)(1)—who are arriving at a port of entry and subject to expedited removal proceedings—and applicants for admission, who are subject to full removal proceedings in (b)(2). ECF No. 5, PageID.92. Respondents claim that if Petitioner's interpretation is followed, it would "eviscerate" any distinction between (b)(1)'s "arriving aliens" and (b)(2)'s "applicants for admission"; in other words, if noncitizens like Petitioner do not fall under (b)(2)'s purview, (b)(2) would have no purpose. *Id.* at PageID.92–93, 97.

Not so. Respondents ignore § 1225's "inspection-centered posture," which makes clear that Congress intended to tie "the concept of 'applicant for admission' to inspection rather than to a freestanding status untethered from the inspection context." *Singh*, 2026 WL 146005, at *20. An immigration officer inspecting a noncitizen "triggers both § 1225(b)'s removal pathways… and the pathways operate as alternative outcomes *of the inspection process*." *Id.* (emphasis added). Section 1225(b)(1) painstakingly divides applicants for admission into subgroups and specifies those who are subject to expedited removal and how these individuals may

19

seek asylum. *Id.* at *18; *see* 8 U.S.C. § 1225(b)(1). Then, § 1225(b)(2) "comes over the horizon" and serves as a "catchall provision" for those individuals seeking entry at the border who are "not covered by § 1225(b)(1)." *Id.* (quoting *Jennings*, 583 U.S. at 287). Individuals who would fall into this catch-all provision include lawful permanent residents returning from abroad who potentially abandoned their lawful permanent resident status by staying abroad too long; individuals entering under the visa waiver program; and U.S. citizens who cannot present proper documentation. *See Zumba v. Bondi*, No. 25-cv-14626 (KSH), 2025 WL 2753496, at *7 (D.N.J. Sept. 26, 2025). Thus, the most logical reading of § 1225(b) is that it governs different categories of noncitizens presenting themselves for *inspection* and prescribes different procedures for those noncitizens.

Moreover, Petitioner's reading of § 1225 and § 1226 also gives cohesive effect to every word in the statute, while Respondents' reading renders much of § 1226(c)(1) redundant. *See In re Arnett*, 731 F.2d 358, 361 (6th Cir. 1984) ("[A] construction of one part or provision of a statute which renders another part redundant or superfluous should be rejected; all parts of a statute should, if possible, be given effect."). In 2025, Congress passed the Laken Riley Act, which amended § 1226 to add subparagraph (c)(1)(E). Subparagraph (c)(1)(E) makes a noncitizen subject to mandatory detention if "he (i) is inadmissible under 8 U.S.C. § 1182(a)(6)(A), (6)(C), or (7) (the 'inadmissibility criterion'); *and* (ii) is charged with,

arrested for, convicted of, or admits to committing certain crimes (the 'criminal conduct criterion')." *Gomes*, 804 F. Supp. 3d at 275. In other words, to be subject to mandatory detention under (c)(1)(E), a noncitizen must meet the inadmissibility criterion *and* the criminal conduct criterion.

"Interpreting Section 1225(b)(2) to apply to noncitizens who are arrested on a warrant while residing in the United States… would render Section 1226(c)(1)(E)'s criminal conduct criterion superfluous for noncitizens who are inadmissible on two of the three grounds specified in the inadmissibility criterion." *Id.* To explain, 8 U.S.C. § 1182(a)(6)(A) states that a noncitizen is inadmissible if he is "present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General." And 8 U.S.C. § 1182(a)(7) states that a noncitizen is inadmissible if he is not in possession of a valid entry document. For noncitizens falling into these categories of inadmissibility, in order to be subject to mandatory detention under § 1226(c)(1)(E), they *also* need to have the requisite criminal history prescribed in that subparagraph. But under Respondents' reading of the statute, these noncitizens are *already* subject to mandatory detention under § 1225(b)(2) regardless of their criminal histories. In other words, Respondents' interpretation renders Congress's *very recent* addition of (c)(1)(E) "pointless." *Lopez-Campos*, 797 F. Supp. 3d at 784. This Court "will not

find that Congress passed the Laken Riley Act to 'perform the same work' that was already covered by § 1225(b)(2)." *Id.*

### iii. *Legislative History and Prior Agency Enforcement*

The legislative history of § 1226(a) further supports Petitioner's reading. Before the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA") passed, which enacted § 1226(a) and § 1225(b) as we know it today,

> …the predecessor statute to Section 1226(a) governed deportation proceedings for all noncitizens arrested within the United States. *See* 8 U.S.C. § 1252(a)(1) (1994) ("Pending a determination of deportability ... any [noncitizen] ... may, upon warrant of the Attorney General, be arrested and taken into custody."); *Hose v. I.N.S.*, 180 F.3d 992, 994 (9th Cir. 1999) ("A deportation hearing was the 'usual means of proceeding against a[ ] [noncitizen] already physically in the United States[.]' "). This predecessor statute, like Section 1226(a), included discretionary release on bond. *See* § 1252(a)(1) (1994) ("[A]ny such [noncitizen] taken into custody may, in the discretion of the Attorney General ... be continued in custody ... [or] be released under bond[.]"). Upon passing IIRIRA, Congress declared that the new Section 1226(a) "restates the current provisions in [the predecessor statute] regarding the authority of the Attorney General to arrest, detain, and release on bond a[] [noncitizen] who is not lawfully in the United States." H.R. Rep. No. 104-469, pt. 1, at 229; *see also* H.R. Rep. No. 104-828, at 210 (same).

*Pizarro Reyes*, 2025 WL 2609425, at *7 (quoting *Rodriguez*, 779 F. Supp. 3d at 1260).

Respondents argue, in contrast, that the history of the IIRIRA actually supports their interpretation of the statute because the purpose of the IIRIRA was to eliminate an "anomaly" whereby immigrants who attempted to lawfully enter the

22

United States were in a worse position than those who entered unlawfully. ECF No. 5, PageID.99–100. But this "historical analysis is overbroad." *Martinez Hernandez v. Raycraft*, No. 3:25-CV-02591-DAR, 2026 WL 698639, at \*12 (N.D. Ohio Mar. 12, 2026). It treats "*one* of Congress'[s] concerns in enacting IIRIRA… as Congress's sole concern driving the statute." *Salcedo Aceros v. Kaiser*, No. 25-cv-06924-EMC (EMC), 2025 WL 2637503, at \*11 (N.D. Cal. Sept. 12, 2025) (emphasis in original). Congress *did* address this concern in other ways, such as providing consolidated exclusion and deportation procedures, imposing a greater burden of proof on unlawful immigrants in removal proceedings, and requiring tougher standards for most discretionary immigration benefits. *Id.* (citing H.R. Rep. 104-469, 12). But Congress "did not fully disrupt the old system, including the system of detention and release," as made clear by the legislative history demonstrating otherwise. *Id.* at \*12.

> Congress' concern about adjusting the law in some respects to reduce inequities in the removal process did not mean Congress intended to entirely up-end the existing detention regime by subjecting *all* inadmissible noncitizens to mandatory detention, a seismic shift in the established policy and practice of allowing discretionary release under Section 1226(a)—the scope of which Congress did not alter.

*Id.*

Indeed, the distinction between § 1225 and § 1226 advanced by Petitioner is a distinction that *Respondents themselves* have historically made. Respondents' prior practice of detaining noncitizens already present in the country under § 1226(a) had

23

been "unbroken for almost thirty years, not to mention the much longer historical practice from which it stems[.]" *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 514 (5th Cir. 2026) (Douglas, J., dissenting); *see, e.g.*, Dep't of Justice, Detention and Removal of Aliens, 62 Fed. Reg. 10,312, 10,323 (Mar 6, 1997) ("Despite being applicants for admission, aliens who are present without having been admitted or paroled… will be eligible for bond and bond redetermination."). And for thirty years, Congress has failed to object or correct DHS's failure to detain "the millions of people it purportedly required to be detained." *Id.* at 515; *see Zemel v. Rusk*, 381 U.S. 1, 11 (1965) ("Congress' failure to repeal or revise in the face of such administrative interpretation… constitute[s] persuasive evidence that that interpretation is the one [Congress] intended.").

"Given this history, the Court properly treats Respondents' assertion of a previously unheralded power to detain non-citizens present in the United States under section 1225(b)(2)(A) with a measure of skepticism." *Martinez*, 792 F. Supp. 3d at 222 (quoting *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 748 (2022) (Gorsuch, J., concurring)) (cleaned up).

> No one has ever thought that § 1225(b)(2)(A) means what [Respondents] say it means—because it does not mean it. Congress did not secretly require two million noncitizens to be detained without bond, when nothing like this had ever been done before, and the whole history of American immigration law suggested it would not be. We would "expect more than simple statutory silence if, and when, Congress were to intend a major departure." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465, 137 S.Ct. 973, 197 L.Ed.2d 398 (2017). This

is to say nothing of this hidden power's enormous "economic and political significance," which is another "reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia*, 597 U.S. at 721, 142 S.Ct. 2587 (quoting *Brown & Williamson*, 529 U.S. at 159, 120 S.Ct. 1291). Amici American Immigration Council and American Immigration Lawyers Association describe the obviously enormous impact of requiring the detention without bond of potentially millions of noncitizens long present in the United States, including noncitizens with citizen spouses, children, and grandchildren, and noncitizens otherwise specially protected by other statutory schemes due to their youth, status as survivors of crime, abuse, or trafficking, or other hardships. This is a quintessential elephant-in-a-mousehole interpretation, and is all the more suspect because of the inconsistency of the agency's views and its longstanding failure to assert this hidden power.

*Buenrostro-Mendez*, 166 F.4th at 516–17 (Douglas, J., dissenting).

For all of the foregoing reasons, Petitioner is unlawfully detained without bond under § 1225(b)(2). Under the INA, Petitioner is subject to discretionary detention under § 1226(a) and is entitled to a bond hearing.

### c.  Due Process

The Due Process Clause of the Fifth Amendment forbids the Government from depriving any person of life, liberty, or property without due process of law. U.S. Const. amend V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (quoting *Reno v.*

25

*Flores*, 507 U.S. 292, 306 (1993)). Indeed, "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. "So, detainees are entitled to notice and opportunity to be heard 'appropriate to the nature of the case.'" *J.G.G.*, 604 U.S. at 673 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).

In determining whether there was a violation of the Due Process Clause, the court must analyze the three factors the Supreme Court set out in *Mathews v. Eldridge*: (1) the private interest affected, (2) the risk of erroneous deprivation of that private interest and the value of any additional safeguards, and (3) the government's interest, including the fiscal and administrative burden the additional safeguards would impose. 424 U.S. 319, 334–35 (1976)).

Petitioner argues that his due process rights have been violated by his detention without an opportunity for bond. ECF No. 2, PageID.42. Respondents argue, in contrast, that a noncitizen's due process rights are coextensive with the removal procedures provided by Congress, and because Petitioner is held under § 1225(b)(2), he has received all the process he is due. ECF No. 5, PageID.83–84.

But as the Court already explained, Petitioner's detention under § 1225(b)(2) is unlawful, and "therefore the process due to him is that which is afforded under Section § 1226(a)." *Lopez-Campos*, 797 F. Supp. 3d at 785. Given that the Court has

found that Petitioner's detention should be under § 1226(a), *not* § 1225(b)(2), "Respondents' argument as to the due process required by § 1225(b)(2) is futile." *Quintero v. Olson*, No. 4:26-cv-34-DJH, 2026 WL 596643, at *3 (W.D. Ky. Mar. 3, 2026). The Court proceeds to examine the *Mathews v. Eldridge* factors.

The first *Mathews* factor weighs strongly in favor of Petitioner. "Petitioner has a significant private interest in avoiding detention, one of the 'most elemental of liberty interests.'" *Sanchez Alvarez v. Noem*, 807 F. Supp. 3d 777, 789 (W.D. Mich. 2025) (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)). Indeed, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

The second *Mathews* factor also supports Petitioner. Removal proceedings "are civil, not criminal, and we assume that they are nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690. The Government "has generally identified two regulatory goals justifying civil immigration detention: 'ensuring the appearance of aliens at future immigration proceedings' and 'preventing danger to the community.'" *Gomez v. Bondi*, No. SA-26-CA-00727-XR, 2026 WL 753307, at *10 (W.D. Tex. Mar. 13, 2026) (citing *Zadvydas*, 533 U.S. at 690). Civil detention is impermissibly "punitive if it becomes a mechanism for retribution or general deterrence." *Id*. (quoting *Kansas v. Crane*, 534 U.S. 407, 412 (2002)). Under the

27

circumstances here, where Petitioner is unlawfully detained under § 1225(b)(2) and has not received the bond hearing he would normally be entitled to under § 1226(a), the risk of the erroneous deprivation of Petitioner's liberty (when he may not be a flight risk or danger to society) is intolerably high. And because Petitioner has no other redress to his detention, "*any* additional safeguard against unreasonable detention will be valuable." *Al-Thuraya v. Warden, Orange Cnty. Corr. Facility*, 809 F. Supp. 3d 135, 145 (S.D.N.Y. 2025) (emphasis in original).

The third *Mathews* factor also favors Petitioner. The Government's interest in detaining Petitioner without bond pending removal is low. While the Government undoubtedly has a weighty interest in ensuring the removal of noncitizens who are here unlawfully, this interest is "in fact protected by the individualized determination by an IJ as to whether an individual should be granted bond at all under existing, well-established procedures" to determine whether he is a risk of flight or danger to society. *Rodriguez Cabrera v. Mattos*, 808 F. Supp. 3d 1159, 1182 (D. Nev. 2025). Moreover, "[i]n immigration court, custody hearings are routine and impose a 'minimal' cost." *Omer G.G. v. Kaiser*, 815 F. Supp. 3d 1098, 1111 (E.D. Cal. 2025).

Given that all *Mathews* factors favor Petitioner, Petitioner's due process rights under the Fifth Amendment are violated by his mandatory detention without bond under § 1225(b)(2).

### d.  Proper Respondents

28

Additionally, Respondents argue that all Respondents should be dismissed except for Tracy Decaussin, the warden of the St. Clair County Jail, who is Petitioner's immediate custodian. In the alternative, Respondents argue that only Kevin Raycraft, the ICE Field Office Director, is the proper respondent. ECF No. 5, PageID.83. Respondents cite *Rumsfeld v. Padilla*, which held that "there is generally only one proper respondent to a given prisoner's habeas petition," and that "the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." 542 U.S. 426, 435 (2004).

However, *Padilla* sidestepped any definitive ruling about how the immediate custodian rule operates in the immigration detention context. *See id.* at 435 n.8. Sixth Circuit case law, which was not affected by *Padilla*'s holding, *see Cid-Barrios v. Raycraft*, 814 F. Supp. 3d 839, 845 (E.D. Mich. 2025), states that the "INS[7] District Director for the district where [the petitioner] is being detained… [is] the proper respondent to his habeas corpus petition." *Roman v. Ashcroft*, 340 F.3d 314, 322 (6th

---

[7] INS, the Immigration and Naturalization Service, was replaced by the Department of Homeland Security in 2003, which itself is divided into three subgroups: USCIS, CBP, and ICE. *See* U.S. Citizenship and Immigration Services, *The Homeland Security Act*, https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/10-why-employers-must-verify-employment-authorization-and-identity-of-new-employees/11-the-homeland-security-act (last visited Apr. 30, 2026). The "INS District Director," as stated in *Roman*, is the equivalent of an ICE District Director today.

Cir. 2003). The Sixth Circuit explained that the District Director is the proper respondent because he is a noncitizen detainee's "immediate custodian." *Roman v. Ashcroft*, 340 F.3d 314, 322 (6th Cir. 2003); *see also id.* at 320 ("[A]lthough the warden of each detention facility technically has day-to-day control over alien detainees, the INS District Director for the district where a detention facility is located 'has power over' alien habeas corpus petitioners.").

In *Roman*, the Sixth Circuit seemingly rejected the idea that more than one respondent could be named in a noncitizen's habeas petition. *See id.* at 321 ("Section 2243 states that a writ of habeas corpus 'shall be directed to *the* person having custody of the person detained,' which suggests that only one individual can properly be named as the respondent to a habeas corpus petition."). However, the Sixth Circuit held that a higher supervisory official, like the Attorney General, could be the proper respondent to a habeas corpus petition under "extraordinary circumstances… necessary to preserve a person's access to habeas corpus relief," such as where immigration authorities exercised their power to transfer a detainee out of district "in a clear effort to evade an alien's habeas petitions." *Id.* at 325–26.

Here, no extraordinary circumstances exist. There is no indication that naming a more remote supervisory authority is necessary to preserve Petitioner's habeas rights. In line with *Roman*, Kevin Raycraft, the Director of the ICE Detroit Field

30

Office, "is the proper respondent to be named" in this habeas petition. *Cid-Barrios*, 814 F. Supp. 3d at 845. All other Respondents are dismissed.

## V.   CONCLUSION

For the foregoing reasons, Petitioner's Petition for Writ of Habeas Corpus [ECF No. 1] is **GRANTED**. Respondent Kevin Raycraft (Detroit Field Office Director for ICE) is **HEREBY ORDERED** to immediately release Petitioner, or in the alternative, provide him with a bond hearing under 8 U.S.C. § 1226(a) **within seven (7) days of the date of this Order.**

**IT IS FURTHER ORDERED** that Respondent shall file a Status Report with this Court **within ten (10) days of the date of this Order** to certify compliance with this Order. The Status Report shall include if and when the bond hearing occurred, if bond was granted or denied, and if denied, the reasons for the denial.

**IT IS FURTHER ORDERED** that U.S. Department of Homeland Security, Executive Office for Immigration Review, Markwayne Mullin (the Secretary of the U.S. Department of Homeland Security), Todd Blanche (the U.S. Attorney General), and Tracy Decaussin (the Administrator of the St. Clair County Jail) are **DISMISSED** from this case.

Petitioner's attorney has requested Attorney's Fees under the Equal Access to Justice Act. Petitioner is **DIRECTED** to file a motion for Attorney's Fees within

**four (4) weeks from the date of this Order** and the Court will resolve that request upon full briefing by the parties.

      **IT IS SO ORDERED.**

Dated:  May 7, 2026                           <u>/s/Gershwin A. Drain</u>
                                            GERSHWIN A. DRAIN
                                            United States District Judge